Filed 1/20/22; Modified and Certified for Pub. 2/17/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re KATHERINE J., a Person Coming Under the Juvenile Court Law. | B313191 (Los Angeles County Super. Ct. No. DK17951) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. NICHOLAS J., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Linda Sun, Judge.  Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

The question raised by this appeal is whether the juvenile court properly concluded that Nicholas J. (father) had failed to prove that a "beneficial parental relationship" under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i)[1] existed between him and his eight-year-old daughter, Katherine J., when terminating his parental rights and freeing Katherine for adoption by her maternal grandparents.

Katherine was in dependency court for five years—more than half of her young life—while her parents struggled with significant ongoing issues of domestic violence and substance abuse. Following multiple failed efforts at reunification, the juvenile court eventually terminated services and, thereafter, terminated the parental rights of both parents,[2] rejecting father's beneficial relationship argument.

In order to avoid termination of parental rights, the statutory beneficial relationship exception requires a parent to prove three elements: (1) regular visitation; (2) the existence of a beneficial parental relationship; and (3) that severing that relationship would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i).) While recognizing that father had maintained

_____

[1] Subsequent undesignated statutory citations are to the Welfare and Institutions Code.

[2] Mother's parental rights were also terminated, but she has not appealed.

2

regular visitation, the juvenile court concluded that these visits created only an "incidental benefit" to Katherine, that his ongoing instability had resulted in two separate removals of Katherine from his care, and that father's violent and contentious relationship with his own parents, very recent and in the presence of Katherine, had caused additional instability and trauma to her.

The juvenile court's ruling, which we review for substantial evidence, is amply supported in the record. Among other things, father's substance abuse was rampant by the time of the selection and implementation hearing. He had previously concealed a crash caused by driving under the influence (DUI) and then refused to implement protective measures for Katherine's benefit. He refused to move out of his parents' home, which resulted in a series of abrupt changes of Katherine's placement. He physically assaulted his own mother, in the presence of Katherine, resulting in multiple facial injuries requiring medical assistance, which he concealed and downplayed. Juxtaposed against this evidence was solely father's testimony about his beneficial relationship with Katherine. But that, too, was contradicted by Katherine herself who confided at times she feared father and did not want to speak to him.

Father claims that part of the juvenile court's analysis impermissibly criticized his absence as a "parental role" in Katherine's life, phraseology that was shortly after the juvenile court's ruling cast into doubt by the Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614, 640 (*Caden C.*) and subsequent appellate cases. This argument is unavailing.

*Caden C.* prohibits juvenile courts from finding against a beneficial relationship *solely because* a parent has failed to

surmount the issues that initially brought the child into dependency care—a standard that few parents facing termination of parental rights could hope to meet. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) But that case does *not* prohibit the juvenile court from determining, as it did here, that the *negative impact* of father's unresolved issues on Katherine were antithetical to the kind of beneficial parental relationship required by section 366.26. *Caden C.* expressly approves this type of reasoning. (*Caden C.*, *supra*, at p. 637 ["A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child"].) The juvenile court's conclusion on this issue is supported by substantial evidence.

Given our ruling on the beneficial relationship issue, we reject father's claim that he affirmatively established a beneficial relationship by a preponderance of the evidence and we decline to address as unnecessary father's second argument regarding the third prong of the beneficial relationship exception.

Accordingly, we affirm the juvenile court's order terminating parental rights.

## FACTS AND PROCEDURAL BACKGROUND

### A. Referral and Voluntary Family Maintenance Case

After 13 years of dating, father and Lisa G. (mother) learned that they were expecting their first child. Katherine was born in 2012. Father and mother married in 2015.

By 2016, the family was having serious problems. According to one of their neighbors, father and mother fought regularly; during these fights, the neighbor could hear father "beat the tar out of the mother."

On February 24, 2016, mother called the police after father repeatedly punched her in the back of the head. Father was

arrested, and mother was granted a three-year restraining order. Five days later, a third party called the Los Angeles County Department of Children and Family Services (the Department) about the incident. The caller expressed concern about father and mother's apparent issues with mental health and alcohol abuse, describing father as "delirious" on the night of his arrest.

On February 26, 2016, the Department began investigating these allegations. Mother told a social worker that father had never physically abused Katherine, but she admitted that the child had been present during past incidents of domestic violence. She later said that she "c[ould]n't even count how many times he physically assaulted me in front of Kat[herine] and away from her. He has pushed me while she was in my arms."

On March 9, 2016, the Department opened a voluntary family maintenance case with the family to address these issues.

On March 15, 2016, the Department learned that father had plead no contest to criminal charges of domestic violence. Father reported that on March 11, he was admitted to a residential substance abuse program.

## B.  Removal, Detention, and Initial Jurisdiction Petition

While father attended residential drug treatment, he visited Katherine several times. Mother initially retained custody of Katherine, but ongoing concerns about her sobriety led to Katherine's removal on June 15, 2016. Katherine was placed with her maternal grandmother.

On June 20, 2016, the juvenile court detained three-year-old Katherine from her parents. That same day, the Department filed a petition alleging jurisdiction over Katherine pursuant to

section 300.[3]  Three of these allegations involved father's conduct.[4]  Count a-1 alleged that mother and father's history of domestic violence placed Katherine at risk of physical harm inflicted nonaccidentally by her parents.  Count b-2 repeated the domestic violence allegations, contending that such violence posed a substantial risk that Katherine would be harmed as a result of her parents' failure to adequately protect her.  Finally, count b-3 alleged that father's substance abuse issues rendered him unable to care for Katherine, placing her at risk of serious physical harm.

Father initially denied that he ever fought with or attacked mother in Katherine's presence.  He also denied ever using substances in Katherine's presence.  On July 27, 2016, however, at the jurisdictional hearing, both parents pled no contest to the (amended) petition.  Accordingly, the juvenile court sustained counts a-1 and b-3, as well as another count related to mother's substance abuse.  Father received reunification services and monitored weekly visitation.

## C.    Father's Resumption of Custody

On September 21, 2017, the juvenile court found that father had made substantial progress and granted him unmonitored visitation.

---

[3] This paragraph describes the jurisdiction petition as amended by the juvenile court.  These amendments modified the phrasing and removed some facts from the original petition, but did not substantially change the character of the Department's allegations.

[4] The remaining two counts concerned mother's alleged substance abuse and mental instability.

6

On May 15, 2018, the juvenile court again found that father had continued making substantial progress towards alleviating the issues causing Katherine's removal and detention. Accordingly, the court placed Katherine in father's custody on the conditions that father reside with the paternal grandparents, continue to participate in services, and submit to drug testing.[5]

In early 2018, father started to show signs of regression, falling out of compliance with drug testing. Between March 1 and April 24, father had only one negative drug test.[6] Four other tests came back provisionally negative but were too diluted to produce definitive results.

On May 4, 2018, one day after his first overnight stay with Katherine, the Department was notified that he had tested positive for alcohol on March 22, 2018.

These issues persisted through the year; between June and October 2018, father had tested positive for marijuana five times and had failed to report for testing three times.

On June 6, 2018, father was arrested for a DUI. Because he did not report his arrest to the Department, it did not find out about the DUI until November 2, 2018. When questioned, father admitted that he had gotten into an accident and had smoked marijuana earlier that day, but said that he did not believe he was under the influence when driving.

---

[5] Mother's progress had been minimal, and her reunification services were terminated.

[6] Father had submitted to a separate drug testing regime through his sober living program, and reportedly tested negative throughout this period.

The police report tells a different story. When police arrived at the scene of the incident, father was about to be transported to the hospital. He "appear[ed] confused, his speech was slow and slurred[,] and his eyes were bloodshot." At the hospital, father admitted to taking " 'a couple hits' of marijuana prior to driving," and failed a field sobriety test. The officer concluded that father's intoxication had caused him to "ma[k]e [an] unsafe turning movement" into a parked car. Father subsequently refused to sign an affidavit agreeing that he would not drive with Katherine in the car.

Despite these issues, father and Katherine's relationship remained largely positive. The Department reported that, during monthly in-person visits, social workers observed "well developed" bonding and "appropriate emotional attachment" between father and Katherine. A family counselor opined that father and Katherine "appear to have a close relationship." At a review hearing on November 13, 2018, the court maintained Katherine's placement, but ordered father not to drive while intoxicated and not to transport Katherine without a valid driver's license.

Notwithstanding, father continued to struggle with his sobriety, recording five unexcused absences from drug testing between November 2, 2018 and February 25, 2019.

On March 5, 2019, father tested positive for cocaine. Father's next drug test was negative, but diluted. He did not show up for his next five scheduled tests.

## D. Second Removal and Supplemental Jurisdiction Petition

Given the significant ongoing and unresolved substance abuse issues and credibility concerns, the Department

8

determined that Katherine could no longer remain in paternal grandparent's home unless father moved out. But by March 26, 2019, father had not relocated. Instead, he called the Department multiple times, requesting permission to continue living in the home with Katherine. Due to father's ongoing lack of cooperation, Katherine was placed with her maternal grandparents.

On March 28, 2019, the Department filed a supplemental petition asserting that, due to father's recurrent substance abuse in violation of court orders, the court's prior disposition no longer effectively protected Katherine.

On May 30, 2019, the juvenile court once again removed Katherine from father's custody and ordered continued reunification services. Thereafter, although father continued to visit with Katherine, he did not take advantage of these court-ordered continued services.

On July 30, 3019, the Department lost contact with father.

On August 13, 2019, Katherine's paternal grandfather informed a social worker that father "no longer desire[d] to have reunification services."

On September 19, 2019, the Department again tried to contact father. He responded via text, stating that he was "living in a tent" on his parents' property and accusing the Department of "abusing [its] power" by "put[ting] [him] in the street." The Department phoned him the next day, but father refused to listen to other people; instead, he erratically continued to "blam[e] the system" for his present circumstances. Things continued to degrade. Father lost his job and stopped submitting to scheduled drug tests altogether. His visits with Katherine became "sporadic."

On October 28, 2019, Katherine's paternal grandparents informed the Department that they were considering evicting father from their property. Although father continued to refuse to meet with social workers, the Department nevertheless provided paternal grandparents with information about housing services that could assist father.

## E. Father Assaults Paternal Grandmother in Front of Katherine

On November 7, 2019, Katherine's maternal grandmother reported that she had recently been informed about a physical altercation between father and Katherine's paternal grandmother. The maternal grandmother stated that father had started arguing with his mother while the pair were out shopping at Walmart with Katherine, and that father had concluded the argument by assaulting and injuring paternal grandmother. Maternal grandparents expressed concern that paternal grandparents had failed to report the incident, indicating a potential inability to protect Katherine from their son's violent excesses.

Paternal grandmother later confirmed maternal grandmother's report. The argument began as a disagreement over Katherine's level in her gymnastics class. As father became increasingly upset, paternal grandmother tried to walk away, holding Katherine's hand in one hand and shopping bags in the other. Father walked up from behind her and pushed paternal grandmother to the ground, causing her to fall face first onto the pavement. She bled from her nose and face, and sustained a black eye. Paternal grandmother said that father apologized, but quickly "disappear[ed] because he knew police were in route."

10

When police arrived, Katherine told them that she was scared by father's behavior and did not want to speak to father. Her therapist said that although Katherine brought up the incident during therapy, she had not wanted to talk about it. Paternal grandmother said that Katherine had a bad dream about the incident, and maternal grandparents later reported that Katherine refused to return to the Walmart.

As of April 21, 2020, Katherine had enrolled in additional mental health services to help her overcome her trauma.

When the Department interviewed father about the incident, he behaved erratically. The interviewer noted that father could not sustain eye contact, appeared wide-eyed, stuttered, and seemed to struggle to speak. He admitted to "slightly pushing" paternal grandmother, but denied that he pushed her hard enough for her to fall. He felt that paternal grandmother "must have tripped." Father also denied fleeing the scene, and instead claimed to leave after paternal grandmother told him to. Father claimed that he desperately wanted to reunify with Katherine, but he declined to submit to an on-demand drug test when asked.

After Katherine's maternal grandmother brought this incident to the Department's attention, all grandparents attended a child and family therapy meeting. At the meeting, paternal grandmother "minimized the incident[,] stating [that] the child was not hurt and the child only had one bad dream about the incident." However, paternal grandmother agreed to obtain a restraining order against father.

Paternal grandparents also agreed to disconnect a voice-activated communication device from Katherine's room in their home to prevent father from speaking to her without a monitor

11

present. These changes disrupted father's visitation schedule, as paternal grandfather was now father's only available monitor and meetings could no longer be held in the family home.

## F. Termination of Reunification Services

Because father had fallen so far out of compliance with his case plan, the Department recommended termination of reunification services and a permanent plan of adoption by maternal grandparents, with whom Katherine had been placed for three of the last four years.

On December 23, 2019, the juvenile court adopted the Department's recommendation. Thereafter, father resumed weekly supervised visits with Katherine at the Department's offices. Katherine told her maternal grandmother that the visits were going okay.

By January 2021, Katherine and father were having visits at public parks, and Katherine told social workers that the visits were good.

Father objected to Katherine's potential adoption by maternal grandparents, telling the Department that he wanted his parents to adopt her instead. He feared that maternal grandmother, with whom he did not have a good relationship, would prevent him from seeing Katherine. He believed that maternal grandmother was "mentally unstable," and accused her of being "negative" towards Katherine. However, he was not able to articulate any actual safety concerns.

## G. Termination of Parental Rights

On May 4, 2021, the juvenile court held a section 366.26 hearing. Father argued that his parental rights should be protected by the beneficial relationship exception to termination. He testified about his strong attachment to Katherine, saying

12

that he had never missed a meeting with her and that "seeing [Katherine] every week" was "the highlight of [his] life." He went so far as to say that "there's never been a time that we've had a bad time or anything like that." He talked at length about the 10 months when he had lived with Katherine and his parents, discussing how involved he was in every aspect of her daily life. He described himself as Katherine's "primary parent" during that time.

He also told the court that he was "the only parent in [Katherine's] life, so it means a lot to her whenever [they] see each other." He described how Katherine "comes running up" and "jumps in [his] arms" when he arrives for a visit, and "gives [him] a big hug and says she loves [him] and that she misses [him] and that she can't wait to see [him]" when he has to leave. Father thought that it was "tough" for both him and Katherine "when [they] don't see each other for a few days[,] even." He opined that terminating his parental rights "would have a negative effect on [Katherine] and that she would feel like she was losing something if her father would no longer be in her life."

Both the Department and Katherine's counsel argued that the beneficial relationship exception should not apply because father failed to prove that he had a strong, beneficial relationship with Katherine. Specifically, they argued that father had not played a parental role in Katherine's life. Father's counsel disagreed, arguing that father had occupied a parental role for Katherine to the maximum extent allowed by the judicial constraints on their relationship.

Ultimately, the juvenile court held that father "ha[d] not been able to establish that his regular visits created benefit to the child," aside from the "incidental benefit" necessarily conferred by

13

a parent's interaction with a child.  The court discussed how "the instability that [father] created . . . caused the child to be taken away from him" twice, resulting in Katherine moving back and forth between placements for much of her young life.  It also stated that father had "created a violent and contentious relationship between himself and his own parents" leading to a restraining order that caused additional instability by disrupting Katherine's visitation schedule.  The court concluded that father "has not occupied a significant parental role and that, even if there is a beneficial relationship, there is no compelling reason to determine that the termination of parental rights would be detrimental" such that they outweighed the benefits of permanency and security that would be gained through adoption.  Accordingly, the court terminated father's parental rights.

Father timely appealed.

## DISCUSSION

### A.    Relevant Law and General Standard of Review

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care.  [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.]"  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)  In other words, if the trial court finds that the child is adoptable, it must terminate parental rights *unless* a statutory exception applies.  (§ 366.26, subds. (b)(1) & (c)(1).)

One of these exceptions is the beneficial relationship exception, which applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation

14

and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

To successfully invoke this exception, the moving parent must establish, by a preponderance of the evidence, each of the following elements: (1) that the parent has regularly visited with the child; (2) that the child would benefit from continuing the relationship; and (3) that terminating the relationship would be detrimental to the child.  (See § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.)

Mere weeks after the juvenile court issued its order terminating father's parental rights, our Supreme Court published an opinion clarifying how juvenile and appellate courts should interpret and apply the parental benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  The court discussed each element of the parental benefit exception in detail.  Because father's arguments heavily rely on *Caden C.*, we will summarize its holdings briefly here.

"The first element [of the exception]—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'  [Citation.]"  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The second element, in which the court must determine whether the child would benefit from continuing the relationship with her parent, is more complicated.  "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'  [Citation.]"  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "[C]ourts often consider how

15

children feel about, interact with, look to, or talk about their parents." (*Ibid.*) *Caden C.* instructs us that "it is not necessary— even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' [Citation.]" (*Ibid.*) Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often "an important source of information about the psychological importance of the relationship for the child." (*Id.* at pp. 632-633, fn. omitted.) Ultimately, the court's role is to decide whether the child has a " 'significant, positive, emotional relationship with [the parent.]' " (*Id.* at p. 633)

The third and final element asks the court to ascertain whether severing parental ties—and thus "terminating [the] parental relationship"—would be detrimental to the child.[7] (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Because any harm caused by loss of this relationship may be significantly mitigated by the child's adoption into a stable, loving home, the court must then perform a delicate balancing act. The "subtle, case-specific inquiry [that] the statute asks courts to perform [is]: does the benefit of

---

[7] The second and third elements of the beneficial relationship exception significantly overlap. For example, evidence that terminating the parental relation would cause harm indicates that the child would lose important relational benefits if severed from her parent.

placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid*.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633-634.)

In addition to these substantive clarifications, *Caden C.* also establishes a hybrid standard of review for the beneficial relationship exception.  The first two elements, which require the juvenile court to "make a series of factual determinations" regarding visitation and the parent-child relationship, "are properly reviewed for substantial evidence." (*Caden C., supra*, 11 Cal.5th at p. 640.)  These determinations should "be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

But "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at p. 640.)  Accordingly, we will not disturb the juvenile court's decision unless it "exceed[s] the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

17

**B.    The Trial Court's Determination that Father Failed
to Establish the Beneficial Relationship Exception Is
Supported by Substantial Evidence**

Father's primary argument relates to the second element of
the beneficial relationship exception.  He claims that the juvenile
court unreasonably discounted the benefits Katherine gained
from her relationship with father because he could not occupy a
traditional parental role in Katherine's life.  Father contends that
*Caden C.* definitively rejects this approach to analyzing the
beneficial relationship exception.  He therefore asks that we
remand this case so that the juvenile court may reconsider
father's evidence under the correct standard.

Courts have long struggled to apply the beneficial
relationship exception to the complex sets of facts that inevitably
accompany decisions about terminating parental rights.
Analyzing the second element of the exception—whether a child
would benefit from a continued relationship with her parent—can
be particularly challenging.  A parent facing termination of
parental rights has necessarily failed to reunify with his child,
presumably because he has not sufficiently overcome the issues
leading to his child's dependency.  Therefore, as *Caden C.* holds,
it is paradoxical to conclude "that the [beneficial relationship]
exception can only apply when the parent *has* made sufficient
progress in addressing the problems that led to dependency."
(*Caden C.*, *supra*, 11 Cal.5th at p. 637.)  Courts must keep in
mind that the benefits a child derives from her relationship with
such a parent, whose presence in the child's life is often limited to
supervised visitation, are typically much subtler than the
benefits the child could expect from a custodial parent.

18

Yet the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 229 [a parent must demonstrate something "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].) The exception requires the existence " 'of a substantial, positive emotional attachment' " between parent and child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

One popular way in which courts have tried to discern the presence of "the mysterious X factor" that transforms a person from a mere "friendly visitor" to a parent with " 'a substantial, positive, emotional attachment' " to his child is by analyzing whether the person occupies a "parental role" in the child's life. (*In re L.A.-O.* (Dec. 27, 2021, E077196) ___ Cal.App.5th ___, ___ [2021 WL 6112442 at p. *7].) However, this analytic tool has the potential to create more problems than it solves.

"[T]he words 'parental role,' standing alone, can have several different meanings," ranging from "the person whom the child regards as his or her parent," the person who demonstrates the "nurturing, supportive, and guiding" characteristics traditionally associated with "good" parenting, or "giving parental care" through such activities as "changing diapers, providing toys and food, and helping with homework." (*In re L.A.-O*, *supra*, ___ Cal.App.5th at p. ___ [2021 WL 6112442 at p. *7].) While each of

19

these definitions may be useful as *factors* to determine the strength of a parent's relationship with their child, none is dispositive on its own. Therefore, problems arise when juvenile courts use the phrase "parental role" without explaining which meaning(s) they impart to it.

We agree with father that *Caden C.* requires juvenile courts to do more than summarily state that a parent has not occupied a parental role in his child's life. (See *In re L.A.-O.*, *supra*, ___ Cal.App.5th at p. ___ [2021 WL 6112442 at p. *8] [reversing termination of parental rights when the juvenile court's "terse" determination that the parents " 'ha[d] not acted in a parental role in a long time' " could have been interpreted as an impermissibly narrow evaluation of the parent-child relationship]; *In re D.M.* (2021) 71 Cal.App.5th 261, 269 [reversing termination of parental rights when the juvenile court's analysis amount to a comparison of the " 'parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)' "].) But we do not agree that the juvenile court committed this error here.

In rejecting father's arguments for the beneficial relationship exception, the juvenile court concluded that father "has not occupied a significant parental role." Critically, it also explained what it meant by this. The court determined that father's unresolved issues with substance abuse and violence had consistently destabilized Katherine's life for years, fatally compromising father's attempts to maintain a strong, positive emotional attachment with her. (*Caden C.*, *supra*, 11 Cal.5th at p. 638 ["the parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court," including the question of

20

whether "the child [would] benefit from continuing the relationship"].)

The record amply supports this finding. For example, by the time of the section 366.26 hearing, father had essentially abandoned any attempt at maintaining sobriety. When he was arrested for a DUI after crashing into a parked car—an arrest which he concealed from the Department for months—father refused to agree that he would not drive with Katherine in the car. This demonstrates a troubling lack of personal responsibility as well as a lack of parental concern for Katherine's safety. When father later tested positive for cocaine use, he stopped showing up for drug tests altogether. He then refused to move out of the family's home, causing Katherine to be sent back to her maternal grandmother's home less than one year after moving in with father and her paternal grandparents. (Compare *In re S.B.* (2008) 164 Cal.App.4th 289, 294-295, 298 [reversing the juvenile court's termination of parental rights where the father acknowledged that his drug use was inexcusable, fully complied with his case plan, remained drug free, and regularly visited his daughter].)

Father maintained that he never used drugs around Katherine, and admittedly, the record of his pleasant visits with Katherine largely corroborates this claim. However, father ignores one bright red flag amidst all his smooth interactions with Katherine. The record shows that father once became so angry with his mother that he pushed her to the ground, in public, while she was holding Katherine's hand. The fall was not trivial; paternal grandmother sustained multiple injuries to her face which needed to be treated by her personal physician. The rapidity with which father escalated from a minor disagreement

21

about Katherine's progress in gymnastics class to physical violence belies father's assertion that "there's never been a time that [Katherine and he] [ha]ve had a bad time or anything like that." Troublingly, the incident is reminiscent of father's first reported incidents of domestic violence, when his substance abuse led him to lash out and beat his wife, even when she was holding Katherine.

Father and his parents initially concealed the altercation from the Department; after maternal grandmother reported it, father and paternal grandmother downplayed the severity of the incident and its effect on Katherine. Again, this apparent lack of concern for Katherine's well-being contradicts father's claims of a substantial, positive emotional attachment.

The trial court specifically cited this incident of recent violence as evidence that father had "created a violent and contentious relationship between himself and his own parents" causing additional instability for Katherine by disrupting father's visitation schedule, to say nothing of the trauma she suffered from witnessing her father injure her grandmother. All in all, these problems not only prevented father from taking Katherine back into his custody, but they also traumatized Katherine, significantly impacting the quality of the relationship with her father.

In opposition to this evidence, and in an effort to demonstrate that his relationship with Katherine had thrived in spite of these issues, father proffered solely his own testimony, consisting largely of his opinions about the daughter-father relationship.[8] (Compare with *Caden C.*, *supra*, 11 Cal.5th at

---

[8] We do not miss the irony in father's protestations about the juvenile court's use of the "parental role" analysis, while at

p. 632 ["courts often consider how *children* feel about, interact with, look to, or talk about their *parents*"] (italics added).)

Father's testimony regarding his relationship with Katherine was contradicted by recent evidence of the times Katherine told others that she was "afraid" of father and that she did not want to speak to him following incidents like the one at Walmart. (Compare with *In re B.D.*, *supra*, 66 Cal.App.5th at pp. 1228-1229 [reversing termination when the juvenile court had no evidence to support a finding that there was not a substantial, positive emotional attachment to parents, particularly in light of parent's testimony which, if credited, indicated a strong attachment].)

Father also adduced no expert testimony or current opinions (for example from social workers or therapists) who might have supported the strength of his relationship with Katherine. (Compare *Caden C.*, *supra*, 11 Cal.5th at pp. 627-628 [relying on bonding study from mother's expert when concluding that severing the parental relationship would be detrimental to the child]; *In re S.B.*, *supra*, 164 Cal.App.4th at pp. 295-296 [relying in part on a bonding study which indicated a strong bond between father and child].)[9]

---

the same time dedicating much of his argument to explaining how he played traditional parenting roles in Katherine's life. In some sense father is tacitly acknowledging that whether he behaved as Katherine's parent is probative of the strength of their parent-child relationship.

[9] We do not suggest that father was *required* to submit a bonding study to prove the beneficial relationship exception. This is but one example of evidence that could have bolstered father's claims of Katherine's allegedly strong attachment.

Although the juvenile court acknowledged that father and Katherine have maintained a warm and loving relationship, there is substantial evidence in the record supporting the juvenile court's conclusion that father's failure to resolve the substance abuse and violence issues that led to and existed throughout Katherine's five-year odyssey in dependency court diminished any benefits she derived from a continuing relationship with him, aside from the incidental benefit necessarily conferred by a parent's fun, playful interactions with his child.[10]

---

[10] Given our primary ruling on the second prong, we necessarily reject father's argument that the beneficial relationship exception applies as a matter of law. Suffice it to say that, when reviewing factual determinations for substantial evidence, we are not permitted to "resolve evidentiary conflicts" in favor of the movant, even if "substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.)

Father also argues that the juvenile court erroneously required him to prove that a "compelling reason" other than his relationship with Katherine supported continuation of his paternal rights. However, a parent must prove *all three* components of the beneficial relationship exception. A failure of proof on any one of them is fatal. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646-647, disapproved on other grounds in *Caden C., supra,* 11 Cal.5th at pp. 637, fn. 6, 638, fn. 7; compare *In re D.M.*, *supra*, 71 Cal.App.5th at p. 271 [remand appropriate where primary source of error is in the third element of the analysis, it thus being unclear "how the [juvenile] court would have exercised its *discretion*" to balance the potential detriment of termination against the potential benefits of adoption without "the benefit of the *Caden C.* analysis"].) Therefore, in light of our ruling on the second prong, we need not address father's

## DISPOSITION

The juvenile court's order is affirmed.


CRANDALL, J.*


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

"compelling reason" contention. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 833, fn. 4 [when an appeal can be definitively resolved on one basis, the reviewing court need not reach an appellant's alternative contentions].)

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re KATHERINE J., | B313191 |
| a Person Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. DK17951) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| Plaintiff and Respondent, | |
| v. | |
| NICHOLAS J., | |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed on January 20, 2022, be modified as follows:

1.  On page 3, last sentence of the first full paragraph, beginning with "But that" and ending with "speak to him" is revised to read as follows:

> But that, too, was contradicted by Katherine herself who, after witnessing father attack her grandmother, confided that she feared father and did not want to speak to him.

2.  On page 23, first sentence of the first full paragraph, beginning with "Father's testimony" and ending with "Walmart" is revised to read as follows:

> Father's testimony regarding his relationship with Katherine was contradicted by recent evidence of Katherine telling others that she was "afraid" of father and that she did not want to speak to him following the Walmart incident.

There is no change in the judgment. Appellant's petition for rehearing is denied.

The opinion in the above-entitled matter filed on January 20, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

---

CRANDALL, J.*          ROTHSCHILD, P. J.          CHANEY, J.

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.